Receipt number AUSFCC-6901206

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BLUE CROSS OF IDAHO HEALTH
SERVICE, INC.,                                        )
                                                     )
Plaintiff,                                           )
                                                     )
v.                                                   )          No. _____
                                                     )
THE UNITED STATES OF AMERICA,                        )
                                                     )
Defendant.                                           )
_____)

21-1033 C

## **COMPLAINT**

Plaintiff Blue Cross of Idaho Health Service, Inc. ("Plaintiff" or "BCI"), by and through

its undersigned counsel, bring this action against Defendant, the United States of America

("Defendant," "United States," or "Government"), and alleges the following:

## **INTRODUCTION**

1.      This action seeks specific monetary relief for Defendant's breach of its statutory

and regulatory obligations to make full and timely cost-sharing reduction ("CSR") payments to

BCI, as mandated by Sections 1402 and 1412 of the Patient Protection and Affordable Care Act

("ACA").  The Government had made such monthly advance CSR payments to BCI for 45

consecutive months from January 2014 until October 12, 2017, when the Government announced

it would stop making such mandatory CSR payments to BCI and other similarly situated

qualified health plan issuers ("QHPs") that had been voluntarily participating on the ACA

Exchanges.

2.      As detailed below, Congress mandated in Section 1402 of the ACA that

Defendant "shall make periodic and timely [CSR] payments" to QHPs as full reimbursement for

the QHPs providing mandatory CSR discounts to certain of their middle- and low-income ACA customers.

3.     In Section 1412 of the ACA, Congress expressly required Defendant to make the advance CSR payments to QHPs, such as BCI, in advance of when those QHPs would provide the CSR discounts to their eligible customers, to minimize the financial burden on those QHPs while they served as the Government's conduit for delivering the federal CSR subsidies to eligible enrollees.

4.     Defendant has failed to honor its mandatory advance CSR payment obligation to BCI, but BCI remains financially obligated under Section 1402 to continue to provide CSR discounts to its eligible customers.  Defendant unlawfully has shifted the financial burden entirely upon BCI.

5.     This action seeks specific monetary relief from Defendant of the statutory CSR payments the Government was mandated to pay Plaintiff in the amount of $66,450,970.77, which is the total amount of monthly CSR payments the Government owes BCI for the full calendar years 2018, 2019, and 2020, but unlawfully has refused to pay.

6.     The liability issues presented in this case in this case are identical to those the Federal Circuit decided in favor of the appellee-health insurers in *Sanford Health Plan v. United States*, 969 F.3d 1370 (Fed. Cir. 2020), where it affirmed Judge Kaplan's ruling that "the government violated a statutory obligation created by Congress in the ACA when it failed to provide Sanford its full cost-sharing reduction payments."  *Sanford Health Plan v. United States*, 139 Fed. Cl. 701, 702 (2018), *aff'd*, 969 F.3d 1370, *reh'g and reh'g en banc denied* (Fed. Cir. 2020).

7.      In *Sanford Health Plan*, the Federal Circuit, relying on the U.S. Supreme Court's decision on ACA risk corridors in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), held that the ACA's "cost-sharing-reduction reimbursement provision imposes an unambiguous obligation on the government to pay money and that the obligation is enforceable through a damages action in the Court of Federal Claims under the Tucker Act." *Sanford Health Plan,* 969 F.3d at 1372.  The Federal Circuit's decision in *Sanford Health Plan* is dispositive of the Government's CSR liability in this case.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action and venue is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because Plaintiff brings claims for monetary claims over $10,000 against the United States based on the Government's violations of money-mandating Acts of Congress, and money-mandating regulations of an executive department.

9.      The actions and/or decisions of the Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and the Department of the Treasury ("Treasury") at issue in this lawsuit were conducted on behalf of the Defendant United States within the District of Columbia.

## PARTIES

10.      Plaintiff BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an independent licensee of the Blue Cross and Blue Shield Association, is an Idaho mutual insurance corporation with headquarters located in Meridian, Idaho.  BCI was a QHP issuer on the Idaho Health Insurance Marketplace for CY 2018, CY 2019, and CY 2020.

11.      Defendant is THE UNITED STATES OF AMERICA.  HHS, CMS, and Treasury are agencies of the Defendant United States of America.

## FACTUAL ALLEGATIONS

### Congress Enacts the Patient Protection and Affordable Care Act

12.     Congress's enactment in 2010 of the ACA, Public Law 111-148, 124 Stat. 119, marked a historic shift in the United States health care market.

13.     Through the ACA, Congress aimed to increase the number of Americans covered by health insurance and decrease the cost of health care in the U.S., and included a series of interlocking reforms designed to expand coverage in the individual health insurance market.  The market reforms guaranteed availability of health care to all Americans, and prohibited health insurers from using factors such as health status, medical history, preexisting conditions, gender, and industry of employment to set premium rates or deny coverage.

14.     The ACA provides that "each health insurance issuer that offers health insurance coverage in the individual . . . market in a State must accept every . . . individual in the State that applies for such coverage."  42 U.S.C. § 300gg–1(a).  The ACA also generally bars insurers from charging higher premiums on the basis of a person's health.  *See* 42 U.S.C. § 300gg.

15.     Through the ACA, Congress created competitive statewide health insurance marketplaces – the ACA Exchanges – that offer health insurance options to consumers.  Section 1311 of the ACA establishes the framework for the Exchanges.  *See* 42 U.S.C. § 18031.

16.     Plaintiff voluntarily participated and offered a QHP in the ACA Marketplace in Idaho after complying with the certification requirements of the Government and/or the state-level operator of that ACA Exchange that it should be certified as a QHP beginning on January 1, 2014 (the first day of the ACA Exchanges).  Plaintiff remained on the ACA exchange during 2018-2020 and through the present day.  For each calendar year in which Plaintiff has participated on the ACA Exchange, its premiums were submitted to and approved by Idaho's

insurance regulator in the spring and/or summer of the previous year (*e.g.*, spring and/or summer of 2017 for CY 2018).

17.     Upon the Government's and/or the state-level operator's evaluation and certification of Plaintiff as a QHP, BCI was required to provide a package of "essential health benefits" on the ACA Exchange on which it voluntarily participated.  42 U.S.C. § 18021(a)(1).

18.     In deciding to become and continue as a QHP each calendar year, BCI understood that in exchange for BCI complying with numerous obligations imposed on QHPs, the Government would comply with many reciprocal obligations imposed on it – including among others, the obligation to make full and timely advance CSR payments to eligible QHPs, like BCI. The Government, however, unlawfully has failed to do so, as detailed below.

### The ACA's Cost-Sharing Reduction Program

19.     To make health insurance more affordable for low- and modest-income Americans, the ACA provides for funding from the Government to eligible enrollees.  Those federal subsidies help offset the two kinds of costs that consumers must pay to obtain health insurance:  (i) health insurance premiums, and (ii) out-of-pocket expenses for health care (such as deductibles, co-pays, co-insurance, the annual limitation on cost-sharing, and similar expenses).

20.     Regarding cost-sharing expenses, Section 1402 of the ACA mandates that, after being notified by HHS that a customer is eligible for CSR discounts, a QHP "shall reduce" a specified portion of that customer's out-of-pocket health care costs for "deductibles, copayments, or similar charges." 42 U.S.C. § 18071(a)(2); § 18022(c)(3)(A).

21.     Separately, regarding health insurance premiums, Section 1401 of the ACA amended the Internal Revenue Code by providing "premium tax credits" from the Government that reduce eligible members' monthly health insurance premiums on ACA Exchange plans for

individuals who earn between 100% and 400% of the federal poverty level, and who satisfy additional criteria.  *See* 26 U.S.C. § 36B (ACA § 1401).

22.     Congress intended CSR discounts to be available to enrollees who meet three criteria:  (i) they are eligible to receive premium tax credits under Section 1401, (ii) their household income is less than 250% of the federal poverty level—in 2017, under $61,500 for a family of four—and (iii) they are enrolled in a "silver" plan offered by the QHP in an ACA Exchange's individual market.  42 U.S.C. § 18071(b), (c)(2), (f)(2); *Annual Update of the HHS Poverty Guidelines*, 82 FR 8831, 8832 (Jan. 31, 2017), attached hereto at Exhibit 01; CMS, *Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Year 2016* at 6 (Dec. 27, 2016), attached hereto at Exhibit 02 (hereinafter, "CMS 2016 CSR Manual").  Section 1402(d) further provides special rules for QHPs that provide CSR discounts to American Indians and Alaska Natives.  *See* 42 U.S.C. § 18071(d).

23.     QHPs, like BCI, that are certified to voluntarily participate in an ACA Exchange must offer at least one "silver" health plan.  *See* 42 U.S.C. § 18071(c)(2).  Before applying CSR discounts, a "silver" plan is structured so that the QHP pays an estimated 70 percent of an enrollee's health care costs, leaving the enrollee responsible for a 30 percent share of their health care costs.  *See* 42 U.S.C. § 18022(d)(1)(B).  Congress intended for CSR discounts subsidized by the Government to further reduce eligible enrollees' health care costs, but not to increase costs for QHPs.

24.     Of the approximately 10.3 million people enrolled through the ACA Exchanges in CY 2017, nearly 5.9 million (about 57%) received CSR discounts.  In CY 2018, about 53% of enrollees received CSR discounts, and 52% of enrollees received CSR discounts in CY 2019. *See* CMS, *2017 Effectuated Enrollment Snapshot* (June 12, 2017), attached hereto at Exhibit 03;

CMS, *Early 2018 Effectuated Enrollment Snapshot* (July 2, 2018), attached hereto at <u>Exhibit 04</u>

CMS, *Early 2019 Effectuated Enrollment Snapshot* (August 12, 2019), attached hereto at <u>Exhibit 05</u>; CMS, *Early 2020 Effectuated Enrollment Snapshot* (July 23, 2020), attached hereto at <u>Exhibit 06</u>.

25.     Although Congress's design called for eligible enrollees to receive CSR discounts directly from their health insurance QHPs, like BCI, Congress did not intend for QHPs to bear the expense of the CSR discounts.  Instead, Congress intended and mandated in Sections 1402 and 1412 of the ACA that the Government "shall" fully reimburse QHPs – and do so in advance – for those CSR discounts through advance CSR payments from the Government to QHPs.

26.     In Section 1402, Congress authorized and expressly required that the Government "***shall*** make periodic and timely [CSR] payments" directly to QHPs, in an amount "***equal to*** the value of the" CSR discounts, to reimburse QHPs for the CSR discounts that QHPs are statutorily required to make to eligible customers.  42 U.S.C. § 18071(c)(3)(A) (emphasis added).

27.     Additionally, in Section 1412, Congress mandated HHS and Treasury to coordinate in providing CSR payments to QHPs in advance of the QHPs' provision of CSR discounts to eligible customers.  *See* 42 U.S.C. § 18082(c)(3) ("Treasury ***shall*** make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies ….") (emphasis added).

28.     Congress purposefully used the word "***shall***" in Sections 1402 and 1412 to clearly indicate that advance CSR payments are a money-mandating obligation of the United States that the Government must make to QHPs, like BCI.  *See Sanford Health Plan*, 969 F.3d at 1382 ("Under the background legal principles set forth in *Maine Community*, section 18071(c)(3) comfortably qualifies as a money-mandating provision[.]"  Advance CSR payments

are not subsidies for QHPs; they are mandatory advance payments owed by the Government to reimburse QHPs for the mandatory CSR discounts the ACA requires QHPs to provide to eligible customers for their out-of-pocket health care expenses.

29.     Congress did not limit in any way the Government's obligation to make full advance CSR payments owed to QHPs, due to appropriations, restriction on the use of funds, the amount of premium tax credits provided to ACA enrollees under 26 U.S.C. § 36B or otherwise in Section 1402, Section 1412, or anywhere else in the ACA.  *Id*. at 1381 ("Section 18071(c)(3) uses 'shall make…payments' language…that is indistinguishable from the 'shall pay' language at issue in *Maine Community* and unmodified by limiting language.").  The Government's obligation to make full advance CSR payments to QHPs is not, and has never been, subject to "budget neutrality."

30.     Congress has not amended or repealed Section 1402 or Section 1412 since enactment of the ACA, and Congress has never taken any legislative action regarding the Government's obligation to make advance CSR payments to QHPs.  *Id*. (noting that the Government has not argued that there is a congressional repeal applicable to § 18071(c)(3)).

31.     The Government thus lacks statutory authority to pay anything less than 100% of the unmade CSR payments due to BCI.

32.     Based on the language of Sections 1402 and 1412 and their implementing regulations, and the representations and conduct of the Government since the CSR program was initiated, when it agreed to commit each year to the ACA Exchanges, BCI understood that it would not bear the expense of the mandatory CSR discounts the ACA required it provide to eligible enrollees.  Instead, BCI understood that the Government would pay BCI in advance for those CSR discounts through "periodic and timely" advance monthly CSR payments.

33.     The Government has failed to honor its mandatory advance CSR payment obligation to BCI since October 12, 2017.

### HHS's Cost-Sharing Reduction Regulations

34.     The HHS Secretary formally delegated authority over the CSR program under Section 1402 and Section 1412 to the CMS Administrator on August 30, 2011, specifically directing that "CMS will consult with the Department of the Treasury."  *See* 76 FR 53903, 53903-04 (Aug. 30, 2011), attached hereto at Exhibit 07.  By authority of this delegation from the HHS Secretary, CMS issued implementing regulations for the CSR program at 45 C.F.R. Part 156.

35.     The process for providing advance CSR payments and later reconciling those payments against CSR discounts is set forth at 45 C.F.R. § 156.430.  *See* 45 C.F.R. § 156.430; CMS 2016 CSR Manual at 6 n.9, Ex. 02.

36.     The CSR payment regulations state that QHPs "***will*** receive periodic ***advance*** payments based on the advance payment amounts calculated in accordance" with a regulatory formula.  45 C.F.R. § 156.430(b)(1) (emphasis added).

37.     HHS and CMS determined that the Government would make "periodic" advance CSR payments monthly, and then in fact the Government made advance CSR payments to QHPs each month from January 2014 until October 2017 – a total of 45 consecutive monthly advance CSR payments.  As HHS explained when it first decided to make monthly CSR payments:

> We proposed to implement a payment approach under which we would make ***monthly*** advance payments to issuers to cover projected cost-sharing reduction amounts, and then reconcile those advance payments at the end of the benefit year to the actual cost-sharing reduction amounts. ***This approach fulfills the Secretary's obligation to make "periodic and timely payments equal to the value of the reductions" under section 1402(c)(3) of the Affordable Care Act.***  We expect that this approach would not require issuers to fund the value of any cost-sharing reductions prior to reimbursement.

78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added) (internal footnote omitted), attached hereto at Exhibit 08.

38.     Under the implementing regulations, an annual CSR reconciliation process occurs following the conclusion of each benefit year, with QHPs notifying the HHS Secretary of CSR discounts provided on behalf of eligible enrollees for actual essential health services.  *See* 45 C.F.R. § 156.430(c); Bulletin, CMS, *Data submission deadline for cost-sharing reduction reconciliation* (Apr. 15, 2016), attached hereto at Exhibit 09 (hereinafter, "CMS CSR Data Submission Bulletin").

39.     HHS then analyzes the relevant data and reconciles the amount of CSR discounts that eligible customers received from a QHP in the previous benefit year against the advance CSR payments that HHS made to the QHP for the same benefit year.  *See* 45 C.F.R. § 156.430(d); CMS CSR Data Submission Bulletin, Ex. 09.

40.     If a discrepancy exists between the previous benefit year's amount of CSR discounts and advance CSR payments, the discrepancy is resolved through either an additional reimbursement "for the difference" that HHS "will" provide to the QHP, or a repayment of "the difference" that the QHP "must" provide to HHS.  45 C.F.R. § 156.430(e); CMS 2016 CSR Manual at 36, Ex. 02.

41.     Through this annual CSR reconciliation and reimbursement process, which historically has been completed by the end of June following the benefit year, HHS and QHPs ensure that the advance CSR payments from the Government to a QHP in a benefit year equal the actual amount of CSR discounts from the QHP to its eligible enrollees in that benefit year, consistent with Congress's mandate to the Government in Section 1402.  *See* 42 U.S.C. §

18071(c)(3)(A) ("[T]he [HHS] Secretary shall make periodic and timely payments to the [QHP] equal to the value of the [CSR discount] reductions.").

**Plaintiff is a QHP for CYs 2018 to 2020**

42.      Based on Congress' statutory commitments set forth in the ACA, and the regulations implementing the ACA, including the CSR program, Plaintiff agreed to become a QHP, offer qualified plans on the Idaho Exchange and to enter into QHP Agreements with Your Health Idaho ("YHI"), the operator of Idaho's ACA Marketplaces.  The QHP Agreements are attached to this Complaint at Exhibits 10 to 12.

43.      On August 1, 2017, BCI executed a QHP Agreement for CY 2018, attached hereto at Exhibit 10.   On August 1, 2018, BCI executed a QHP Agreement for CY 2019, attached hereto at Exhibit 11.   On August 5, 2019, BCI executed a QHP Agreement for CY 2020, attached hereto at Exhibit 12.

44.      Guidance from HHS and CMS to Issuers on Federally-Facilitated Exchanges ("FFE") and State Partnership Exchanges on April 5, 2013, stated that, "A signed QHP Agreement with CMS will complete the certification process in an FFE or State Partnership Exchange.  The Agreement will highlight and memorialize many of the QHP issuer's statutory and regulatory requirements and will serve as an important reminder of the relationship between the QHP issuer and CMS."  Letter from CMS to Issuers on Federally-Facilitated Exchanges and State Partnership Exchanges at 23 (Apr. 5, 2013), attached hereto at Exhibit 13.

45.      Had BCI known that the Government would fail to fully and timely make the mandatory advance statutory CSR payments owed to BCI, then BCI would not have agreed to the statutory obligation to provide CSR discounts to eligible members.

**HHS's and CMS's Interpretation of**
**The Government's Cost-Sharing Reduction Payment Obligations**

46.     Starting in January 2014 and continuing uninterrupted until October 2017, the HHS and Treasury Secretaries – including those in the Trump Administration – made the Government's monthly advance CSR payments to QHPs, including BCI, as Congress required in the ACA and consistent with their interpretation of the Government's money-mandating payment obligations under the ACA. *See* CMS 2016 CSR Manual at 36, Ex. 02 ("Payments to issuers for the cost-sharing reduction component of advance payments began in January 2014.").

47.     In rulemaking as early as 2012, HHS and CMS publicly wrote in the Federal Register that "if the actual amounts of [CSR discounts provided from QHPs to eligible enrollees] exceed the advance [CSR] payment amounts provided to the [QHP by HHS] …, ***HHS would reimburse the issuer for the shortfall***, assuming that the [QHP] has submitted its actual [CSR] amount report to HHS in a timely fashion." 77 FR 73118, 73176 (Dec. 7, 2012) (Proposed Rule) (emphasis added), attached hereto at Exhibit 14.

48.     BCI has always timely submitted any required CSR reports to HHS.

49.     In final rulemaking of March 11, 2013, while QHPs like BCI were contemplating whether to commit to participating in the ACA Exchanges, HHS and CMS announced their interpretation that "***cost-sharing reductions are reimbursed by the Federal government***." 78 FR 15409, 15481 (Mar. 11, 2013) (Final Rule) (emphasis added), Ex. 08. In describing the CSR advance payment and reconciliation process, HHS and CMS expressly acknowledged "the [HHS] Secretary's ***obligation*** to make 'periodic and timely payments equal to the value of the reductions' under section 1402(c)(3) of the Affordable Care Act." *Id.* at 15486 (emphasis added). HHS and CMS expressed their understanding of the statutory requirement that "***QHP issuers will be made whole*** for the value of all cost-sharing reductions provided through the

- 12 -

reconciliation process after the close of the benefit year." *Id.* at 15488 (emphasis added).

Finally, HHS and CMS expressed their interpretation that "***Section 1402(c)(3) provides for the Secretary of HHS to make payments to QHP issuers equal to the value of the cost-sharing reductions.***" *Id.* at 15489 (emphasis added).

50.    In final rulemaking of March 11, 2014, HHS and CMS stated their interpretation that:

> ***Section 1402(c)(3)*** of the Affordable Care Act directs a QHP issuer to notify the Secretary of cost-sharing reductions made under the statute, and ***directs the Secretary to make periodic and timely payments to the QHP issuer equal to the value of those reductions.*** Section 1412(c)(3) of the Affordable Care Act permits advance payments of cost-sharing reduction amounts to QHP issuers based upon amounts specified by the Secretary. Under these authorities, we established a payment approach in the 2014 Payment Notice under which monthly advance payments made to issuers to cover projected cost-sharing reduction amounts are reconciled after the end of the benefit year to the actual cost-sharing reduction amounts.

79 FR 13743, 13805 (Mar. 11, 2014) (Final Rule) (emphasis added), attached hereto at <u>Exhibit 15</u>.

51.    In early 2015, in guidance issued to QHPs regarding the CSR reconciliation process, HHS and CMS stated that "[t]he [ACA] requires [QHPs] to provide cost-sharing reductions to eligible enrollees in such [silver] plans, ***and provides for issuers to be reimbursed for the value of those cost-sharing reductions***" by the Government. Bulletin, CMS, *Timing of Reconciliation of Cost-Sharing Reductions for the 2014 Benefit Year* at 1 (Feb. 13, 2015), attached hereto at <u>Exhibit 16</u> (hereinafter, "CMS 2014 CSR Bulletin") (emphasis added).

52.    In a December 2016 manual regarding CSR reconciliation, HHS and CMS again acknowledged that under Sections 1402 and 1412 of the ACA, "periodic and timely payments equal to the value of [QHPs' CSR] reductions ***are required to be made to issuers*** … in advance" by the Government. CMS 2016 CSR Manual at 6 & n.8 (emphasis added), <u>Ex. 02</u>.

53.     HHS and CMS implemented the CSR reconciliation process for both CY 2014 and CY 2015 in the middle of 2016, and BCI timely submitted its CSR data to CMS and participated in the process.  *See* CMS 2014 CSR Bulletin at 1-2, Ex. 16; CMS CSR Data Submission Bulletin, Ex. 09; CMS, *Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for Benefit Years 2014 and 2015* at 6 (Mar. 16, 2016), attached hereto at Exhibit 17 (hereinafter, "CMS 2014-15 CSR Manual").

54.     These repeated public statements by HHS and CMS were made or ratified by representatives of the Government, including, but not limited to, the HHS Secretary and Kevin J. Counihan, the CMS official designated as the Chief Executive Officer of the ACA Health Insurance Marketplaces and Director of CMS's Center for Consumer Information and Insurance Oversight ("CCIIO"), which regulates health insurance at the federal level.  *See* CMS Leadership, Center for Consumer Information and Insurance Oversight, Kevin Counihan, https://www.cms.gov/About-CMS/Leadership/cciio/Kevin-Counihan.html (last visited Jan. 12, 2017), attached hereto at Exhibit 18 (Mr. Counihan's job description).  Mr. Counihan's successor was Randy Pate, who is the current CMS Deputy Administrator and the Director of the Center for Consumer Information and Insurance Oversight.  Mr. Pate "leads CMS' work on the individual and small group markets, including the Health Insurance Exchanges."  CMS Leadership, Center for Consumer Information and Insurance Oversight, Randy Pate, available at: https://www.cms.gov/About-CMS/Leadership/cciio/Randy-Pate.html.

55.     After the Presidential inauguration on January 20, 2017, HHS, CMS and Treasury continued to make the Government's monthly advance CSR payments to QHPs.

56.     In the middle of 2017, HHS and CMS implemented the CSR reconciliation process for CY 2016, and BCI timely submitted its CSR data to CMS and participated in the process.  *See* CMS 2016 CSR Manual at 8-9 & 36, Ex. 02.

57.     The Government continued making monthly mandatory advance CSR payments to QHPs, including BCI, through September 2017 (for October 2017 CSR discounts) as required by the ACA and its implementing regulations, as well as by the Government's contracts with Plaintiff.

**The Government Breaches its Statutory Cost-Sharing Reduction Payment Obligations**

58.     On October 12, 2017, the Administration announced that the Government would no longer make CSR payments to QHPs.  In a press statement, the White House stated that:

> Based on guidance from the Department of Justice, the Department of Health and Human Services has concluded that there is no appropriation for cost-sharing reduction payments to insurance companies under [the ACA]. In light of this analysis, the Government cannot lawfully make the cost-sharing reduction payments.

Dan Mangan, *Obamacare bombshell: Trump kills key payments to health insurers*, CNBC, Oct. 12, 2017, attached hereto at Exhibit 19.

59.     HHS and CMS also issued a press release on October 12, 2017, stating:

> After a thorough legal review by HHS, Treasury, OMB, and an opinion from the Attorney General, we believe that ... Congress has not appropriated money for CSRs, and we will discontinue these payments immediately.

Press Release, HHS & CMS, *Trump Administration Takes Action to Abide by the Law and Constitution, Discontinue CSR Payments* (Oct. 12, 2017), attached hereto at Exhibit 20.

60.     Attached to the HHS and CMS press statement was an October 12, 2017 order from HHS Acting Secretary Eric Hargan to CMS Administrator Seema Verma, instructing that "CSR payments to issuers must stop, effective immediately.  CSR payments are prohibited

unless and until a valid appropriation exists."  Letter from Eric Hargan, HHS Acting Secretary,
to Seema Verma, CMS Administrator (Oct. 12, 2017), attached hereto at Exhibit 21.

61.     Attached to Mr. Hargan's order was an October 11, 2017 legal opinion signed by
U.S. Attorney General Jeff Sessions and addressed to the Treasury Secretary and HHS Acting
Secretary.  *See* Letter from Jefferson B. Sessions III, U.S. Attorney General, to Steven Mnuchin,
Secretary of the Treasury & Don Wright, HHS Acting Secretary (Oct. 11, 2017), attached hereto
at Exhibit 22.

62.     Former U.S. Attorney General Sessions admitted that Section 1402 "***requires***
insurers offering policies through ACA exchanges to reduce co-payments and other out-of-
pocket costs for certain policyholders (reductions referred to in the ACA as "Cost-Sharing
Reductions")."  *Id.* at 2 (citing ACA § 1402) (emphasis added).

63.     U.S. Attorney General Sessions also admitted that Section 1412 "authorizes"
advance CSR payments from the Government to QHPs for the cost of QHPs' CSR discounts to
eligible customers.  *Id.* Section 1402 mandates that HHS "shall" make CSR payments to QHPs,
and Congress never made those money-mandating obligations subject to the availability of
appropriations or limited the Government's CSR payment obligation in any way.

64.     Pursuant to the Administration's decision to cease making required advance CSR
monthly payments to QHPs, HHS and Treasury have not made any of the Government's advance
CSR payments to QHPs, like BCI, in and after October 2017.

65.     On October 13, 2017, CMS's Financial Management Coordination Center
("FMCC") emailed to BCI and other QHPs a letter stating that:

> [CMS] will discontinue payments of [CSR] to issuers effective in October.
> … For the October monthly payment cycle and beyond, CMS will withhold
> advance CSR payments for the current month of coverage and will not make
> any adjustments to CSR payment amounts related to retroactive enrollment

> data changes for prior months of 2017. Issuers will therefore receive no net payment of 2017 advance CSR in the October and future payment cycles. … CSR reconciliation payments for the 2016 benefit year, including any payments owed as the result of reported discrepancies, will not be made. CMS will collect CSR reconciliation charges that result from any discrepancies.

Email from CMS FMCC to BCI (Oct. 13, 2017).

66.    On October 20, 2017, CMS emailed to BCI and other QHPs a notice that "CMS has published a supplemental FAQ document today related to the cessation of cost-sharing reductions to provide additional detail on the impacts of this change to issuers' enrollment and payment data processing," and provided a link to the referenced FAQ document. Email from CMS FMCC to BCI (Oct. 20, 2017).

67.    CMS's FAQ document of October 20, 2017, confirmed that:

> For the October monthly payment cycle and beyond, CMS will not make advance CSR payments, and will not make any adjustments to CSR payment amounts related to retroactive enrollment data changes for prior months of 2017, unless Congress appropriates funding for these payments. Issuers will therefore receive no net payment of 2017 advance CSR in the October and future payment cycles.

Bulletin, CMS, *FAQ on Cessation of Payment of Cost-sharing Reductions* at 1 (Oct. 20, 2017), attached hereto at Exhibit 23.

68.    Regarding payments and charges from the CSR reconciliation process established in the Government's implementing regulations, the FAQ document stated that:

> CSR reconciliation payments for the 2016 benefit year and prior year restatements previously scheduled for the October 2017 payment cycle or future cycles, including any payments calculated as the result of reported discrepancies, will not be made. However, if a discrepancy results in an overpayment to the issuer, CMS will proceed with the collection of those charges after the issuer has been notified of CMS's discrepancy decision.

*Id.*

69.     The Government, in relying on the foregoing statements to stop making the statutorily required CSR payments, however, ignored that "[i]t has long been established that the mere failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *Prairie Cnty., Mont. v. United States*, 782 F.3d 685, 690 (Fed. Cir.), *cert. denied*, 136 S. Ct. 319 (2015); *see also Maine Community Health Options*, 140 S. Ct. at 1323; *Sanford Health Plan*, 969 F.3d at 1381 ("It makes no difference to this conclusion that Congress did not specifically appropriate money to make the payments.").

70.     The United States Supreme Court confirmed in *Maine Cmty. Health Options* that a similar ACA statutory obligation that HHS "shall" pay monies owed to insurers for the risk corridors program was itself (without express "budget authority") a binding, money-mandating government "obligation neither contingent on nor limited by the availability of appropriations or other funds." 140 S. Ct. at 1323; *cf.* ACA § 1412(c)(3) (the Treasury Secretary "shall make" advance CSR payment to QHPs. The Supreme Court also held the ACA's statutory payment obligation was unaffected by the Anti-deficiency Act because the "obligation was authorized" by the ACA's risk corridors statute. *Id*. at 1322.

71.     Applying the Supreme Court's holding in *Maine Cmty. Health Options*, the Federal Circuit held that the ACA's cost-sharing provision at issue in this case similarly is a binding, money-mandating Government obligation, regardless of whether Congress has specifically appropriated money to make those payments. *Sanford Health Plan*, 969 F.3d at 1381.

72.     The Federal Circuit accordingly held in *Sanford Health Plan* that the Government is liable to QHPs, like BCI, for failure to pay the advance monthly CSR payments mandated by

the statute. *Sanford Health,* 969 F.3d at 1372.  The Federal Circuit's decision in *Sanford Health Plan* is dispositive of the Government's liability for unpaid CSR payments in this case.

73.    The Federal Circuit's ruling in *Sanford Health Plan* is consistent with the rulings of every U.S. Court of Federal Claims Judge to have ruled on liability in a CSR case.  *See Montana Health Co-Op v. United States*, 139 Fed. Cl. 213 (2018); *Sanford Health Plan*, 2018 WL 4939418, *aff'd*, 969 F.3d 1370 (2020); *Common Ground Healthcare Coop. v. United States*, 142 Fed. Cl. 38 (2019); *Cmty. Health Choice, Inc. v. United States*, 141 Fed. Cl. 744 (2019); *Local Initiative Health Auth. for L.A. Cty. v. United States*, 142 Fed. Cl. 1 (2019); *Maine Cmty. Health Options v. United States*, 142 Fed. Cl. 53 (2019).

74.    These rulings, which have held the Government liable for its CSR statutory payment obligations in all of these cases, are consistent with and bolstered by the Supreme Court's decision in *Maine Community Health Options*, 140 S. Ct. 1308, and the Federal Circuit's CSR liability ruling in *Sanford Health Plan*, 969 F.3d at 1381.

75.    The monetary relief BCI seeks is specific—the statutorily mandated unmade CSR payments to which the Plaintiff is entitled on and after January 1, 2018 through to the end of 2020.

### **BCI's Advance Cost-Sharing Reduction Payments Owed Since January 1, 2018**

76.    Between January 2014 and October 12, 2017, Defendant made monthly advance CSR payments to BCI on or about a date between the nineteenth and twenty-second of each month.  *See* Decl. of Elizabeth Parish in Supp. of Defs.' Opp'n to Pls.' Mot. for a TRO, *Calif. v. Trump*, No. 3:17-cv-5895-VC, ECF No. 35-3, at ¶ 5 (Oct. 20, 2017), attached hereto at <u>Exhibit 24</u> (CMS official declaring under oath that "monthly [advance CSR] payments [are] scheduled for a pre-established date between the nineteenth and twenty-second of each month").

77.    The Administration announced its October 12, 2017 decision to stop making the Government's advance CSR payments before the Government made its expected October 20,

2017 monthly advance CSR payment to BCI.  *See id.* ("October payments are being made without CSR payments according to this schedule on October 20, 2017.").

78.     Defendant thus has made no CSR payments to BCI since September 2017.

79.     In the October 13, 2017 CMS FMCC email to BCI and other QHPs, CMS stated that it would continue to report the amount of monthly advance CSR payments a QHP would have received from the Government in and after October 2017, but that the same monthly payment report "will also show a lump-sum issuer-level manual adjustment that reverses the total net advance CSR payment," resulting in no CSR payment being paid despite the Government's obligations to make such payments each month.

80.     CMS's FAQ document of October 20, 2017 also confirmed that "[QHPs] will see detailed advance CSR payments appear as in prior months on their payment reports[,] … [which] will also show a lump-sum issuer-level manual adjustment that reverses the total net advance CSR payment."  Bulletin, CMS, *FAQ on Cessation of Payment of Cost-sharing Reductions* at 1 (Oct. 20, 2017), Ex. 23.

81.     BCI is owed $30,970,025.78 in unpaid CSR payments for CY 2018 following reconciliation of CSR payment amounts, but the Government has refused to pay this amount in violation of its statutory and regulatory obligations.

82.     The Government also owes BCI unpaid CSR payments for each month in 2019 in the total amount of $23,521,750.29 for CY 2019 following reconciliation of CSR payment amounts. The Government has likewise refused to pay this amount in violation of its statutory and regulatory obligations.

83.     The Government also owes BCI unpaid CSR payments for each month in 2020 in the total amount of $11,959,194.70 for CY 2020 following reconciliation of CSR payment

amounts. The Government has likewise refused to pay this amount in violation of its statutory and regulatory obligations.

84.    BCI demands full and immediate payment from the United States in the total amount of unpaid CSR payments the Government owes BCI of $66,450,970.77.

## COUNT I

**Violation of Federal Statute and Regulation for 2018 CSRs The Government Owes BCI**

85.    Plaintiff realleges and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

86.    Plaintiff is entitled to the unmade CSR payments owed under § 1402's plain terms. Section 1402(c)(3)(A) of the ACA mandates compensation, expressly stating that a QHP issuer: "making reductions under this subsection shall notify the Secretary of such [cost-sharing] reductions and the Secretary *shall make periodic and timely payments* to the issuer equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A) (emphasis added).

87.    Section 1412(c)(3) of the ACA likewise mandates compensation, expressly stating that the "Treasury [Secretary] shall make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies."  42 U.S.C. § 18082(c)(3).

88.    HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(a) also mandates compensation, expressly stating that "A QHP issuer will receive periodic advance [CSR] payments."  45 C.F.R. § 156.430(a).

89.    Furthermore, HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(e)(1) mandates compensation, expressly stating that "If the actual amounts of cost-sharing reductions [provided by QHPs to enrollees] are – (1) More than the amount of advance payments provided [by HHS and Treasury to a QHP] and the QHP issuer has timely provided the

actual amounts of cost-sharing reductions as required …, HHS will reimburse the QHP issuer for the difference."  45 C.F.R. § 156.430(e)(1).

90.     HHS and CMS have long recognized "the [HHS] Secretary's **obligation** to make 'periodic and timely payments equal to the value of the [QHPs' CSR] reductions' under section 1402(c)(3) of the Affordable Care Act."  78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added).

91.     BCI is entitled under Section 1402(c)(3)(A) of the ACA, Section 1412(c)(3) of the ACA, and 45 C.F.R. § 156.430(a) and (e)(1) to receive monthly advance CSR payments from Defendant in an amount equal to the full amount of the monthly CSR discounts that BCI provides to its eligible customers for essential health benefits.

92.     BCI has provided CSR discounts to its eligible customers for essential health benefits every month since January 2014.

93.     Every month between January 2014 and September 2017, Defendant complied with its obligations and made mandatory monthly advance CSR payments to BCI.  *See* 42 U.S.C. § 18071(a).

94.     BCI has not received any CSR payments from Defendant since October 2017, as a result of the Government's unlawful decision on October 12, 2017 to breach its statutory and regulatory obligations and stop making monthly advance CSR payments to BCI and other QHPs.

95.     Despite the Government's unlawful decision, the Government has continued to acknowledge that the CSR statute requires it to advance CSR payments owed to BCI each month, and CMS has kept track of the advance monthly payments it should have made to QHPs since October 2017.

96.     Congress did not repeal, amend or otherwise abrogate the statutory obligation created by Sections 1402 and 1412 to make full and timely advance CSR payments to QHPs, including BCI, that provide CSR discounts to their eligible customers for essential health benefits.

97.     The Federal Circuit's decision in *Sanford Health Plan* is dispositive of the Government's liability in this case as the Government breached the identical statutory CSR payment obligation to BCI in this case.

98.     The Government's failure to make full and timely advance CSR payments to BCI since October 12, 2017 constitutes a violation and breach of the Government's mandatory payment obligations under Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1).

99.     Plaintiff's statutory claims seek specific relief—the statutorily mandated unmade CSR payments to which they are entitled, and there is no statutory or other legal basis to undermine Plaintiff's entitlement to those specific statutory CSR payments Plaintiff is owed.

100.    Section 1402 prescribes a precisely determinable CSR payment amount.  Nothing in the ACA requires (or permits) the mandatory payments under §1402 to be reduced based on the size of premiums charged by an insurer, an insurer's rate of return on sales, its overall profit, or any other market or external factors.

101.    The statutorily-mandated CSR payments the Government owes Plaintiff cannot be reduced as a result of contracts-based mitigation or offset theories that are not set forth in the ACA and have no statutory basis.  The ACA imposes no obligation of mitigation on QHPs, and no right of offset to the Government with respect to the QHP issuers' unconditional right to receive the statutorily-mandated CSR payments due.

102.     As a direct result of the United States' violation of Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1), BCI has not been paid the 2018 CSR payments owed and has been damaged in the amount of at least $30,970,025.78 as of the filing date of its this Complaint, together with post-judgment interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT II

**Violation of Federal Statute and Regulation for 2019 CSRs The Government Owes BCI**

103.     Plaintiff realleges and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

104.     Plaintiff is entitled to the unmade CSR payments owed under § 1402's plain terms. Section 1402(c)(3)(A) of the ACA mandates compensation, expressly stating that a QHP issuer: "making reductions under this subsection shall notify the Secretary of such [cost-sharing] reductions and the Secretary *shall make periodic and timely payments* to the issuer equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A) (emphasis added).

105.     Section 1412(c)(3) of the ACA likewise mandates compensation, expressly stating that the "Treasury [Secretary] shall make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies." 42 U.S.C. § 18082(c)(3).

106.     HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(a) also mandates compensation, expressly stating that "A QHP issuer will receive periodic advance [CSR] payments." 45 C.F.R. § 156.430(a).

107.     Furthermore, HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(e)(1) mandates compensation, expressly stating that "If the actual amounts of cost-sharing reductions [provided by QHPs to enrollees] are – (1) More than the amount of advance payments provided [by HHS and Treasury to a QHP] and the QHP issuer has timely provided the

actual amounts of cost-sharing reductions as required …, HHS will reimburse the QHP issuer for the difference."  45 C.F.R. § 156.430(e)(1).

108.    HHS and CMS have long recognized "the [HHS] Secretary's **obligation** to make 'periodic and timely payments equal to the value of the [QHPs' CSR] reductions' under section 1402(c)(3) of the Affordable Care Act."  78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added).

109.    BCI is entitled under Section 1402(c)(3)(A) of the ACA, Section 1412(c)(3) of the ACA, and 45 C.F.R. § 156.430(a) and (e)(1) to receive monthly advance CSR payments from Defendant in an amount equal to the full amount of the monthly CSR discounts that BCI provides to its eligible customers for essential health benefits.

110.    BCI has provided CSR discounts to its eligible customers for essential health benefits every month since January 2014.

111.    Every month between January 2014 and September 2017, Defendant complied with its obligations and made mandatory monthly advance CSR payments to BCI.  *See* 42 U.S.C. § 18071(a).

112.    BCI has not received any CSR payments from Defendant since October 2017, as a result of the Government's unlawful decision on October 12, 2017 to breach its statutory and regulatory obligations and stop making monthly advance CSR payments to BCI and other QHPs.

113.    Despite the Government's unlawful decision, the Government has continued to acknowledge that the CSR statute requires it to advance CSR payments owed to BCI each month, and CMS has kept track of the advance monthly payments it should have made to QHPs since October 2017.

114.     Congress did not repeal, amend or otherwise abrogate the statutory obligation created by Sections 1402 and 1412 to make full and timely advance CSR payments to QHPs, including BCI, that provide CSR discounts to their eligible customers for essential health benefits.

115.     The Federal Circuit's decision in *Sanford Health Plan* is dispositive of the Government's liability in this case as the Government breached the identical statutory CSR payment obligation to BCI in this case.

116.     The Government's failure to make full and timely advance CSR payments to BCI since October 12, 2017 constitutes a violation and breach of the Government's mandatory payment obligations under Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1).

117.     Plaintiff's statutory claims seek specific relief—the statutorily mandated unmade CSR payments to which they are entitled, and there is no statutory or other legal basis to undermine Plaintiff's entitlement to those specific statutory CSR payments Plaintiff is owed.

118.     Section 1402 prescribes a precisely determinable CSR payment amount.  Nothing in the ACA requires (or permits) the mandatory payments under §1402 to be reduced based on the size of premiums charged by an insurer, an insurer's rate of return on sales, its overall profit, or any other market or external factors.

119.     The statutorily-mandated CSR payments the Government owes Plaintiff cannot be reduced as a result of contracts-based mitigation or offset theories that are not set forth in the ACA and have no statutory basis.  The ACA imposes no obligation of mitigation on QHPs, and no right of offset to the Government with respect to the QHP issuers' unconditional right to receive the statutorily-mandated CSR payments due.

120.     As a direct result of the United States' violation of Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1), BCI has not been paid the 2019 CSR payments owed and has been damaged in the amount of at least $23,521,750.29 as of the filing date of its this Complaint, together with post-judgment interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT III

**Violation of Federal Statute and Regulation for 2020 CSRs The Government Owes BCI**

121.     Plaintiff realleges and incorporate by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

122.     Plaintiff is entitled to the unmade CSR payments owed under § 1402's plain terms. Section 1402(c)(3)(A) of the ACA mandates compensation, expressly stating that a QHP issuer: "making reductions under this subsection shall notify the Secretary of such [cost-sharing] reductions and the Secretary *shall make periodic and timely payments* to the issuer equal to the value of the reductions." 42 U.S.C. § 18071(c)(3)(A) (emphasis added).

123.     Section 1412(c)(3) of the ACA likewise mandates compensation, expressly stating that the "Treasury [Secretary] shall make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies." 42 U.S.C. § 18082(c)(3).

124.     HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(a) also mandates compensation, expressly stating that "A QHP issuer will receive periodic advance [CSR] payments." 45 C.F.R. § 156.430(a).

125.     Furthermore, HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(e)(1) mandates compensation, expressly stating that "If the actual amounts of cost-sharing reductions [provided by QHPs to enrollees] are – (1) More than the amount of advance payments provided [by HHS and Treasury to a QHP] and the QHP issuer has timely provided the

actual amounts of cost-sharing reductions as required …, HHS will reimburse the QHP issuer for the difference."  45 C.F.R. § 156.430(e)(1).

126.    HHS and CMS have long recognized "the [HHS] Secretary's **obligation** to make 'periodic and timely payments equal to the value of the [QHPs' CSR] reductions' under section 1402(c)(3) of the Affordable Care Act."  78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added).

127.    BCI is entitled under Section 1402(c)(3)(A) of the ACA, Section 1412(c)(3) of the ACA, and 45 C.F.R. § 156.430(a) and (e)(1) to receive monthly advance CSR payments from Defendant in an amount equal to the full amount of the monthly CSR discounts that BCI provides to its eligible customers for essential health benefits.

128.    BCI has provided CSR discounts to its eligible customers for essential health benefits every month since January 2014.

129.    Every month between January 2014 and September 2017, Defendant complied with its obligations and made mandatory monthly advance CSR payments to BCI.  *See* 42 U.S.C. § 18071(a).

130.    BCI has not received any CSR payments from Defendant since October 2017, as a result of the Government's unlawful decision on October 12, 2017 to breach its statutory and regulatory obligations and stop making monthly advance CSR payments to BCI and other QHPs.

131.    Despite the Government's unlawful decision, the Government has continued to acknowledge that the CSR statute requires it to advance CSR payments owed to BCI each month, and CMS has kept track of the advance monthly payments it should have made to QHPs since October 2017.

132.     Congress did not repeal, amend or otherwise abrogate the statutory obligation created by Sections 1402 and 1412 to make full and timely advance CSR payments to QHPs, including BCI, that provide CSR discounts to their eligible customers for essential health benefits.

133.     The Federal Circuit's decision in *Sanford Health Plan* is dispositive of the Government's liability in this case as the Government breached the identical statutory CSR payment obligation to BCI in this case.

134.     The Government's failure to make full and timely advance CSR payments to BCI since October 12, 2017 constitutes a violation and breach of the Government's mandatory payment obligations under Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1).

135.     Plaintiff's statutory claims seek specific relief—the statutorily mandated unmade CSR payments to which they are entitled, and there is no statutory or other legal basis to undermine Plaintiff's entitlement to those specific statutory CSR payments Plaintiff is owed.

136.     Section 1402 prescribes a precisely determinable CSR payment amount.  Nothing in the ACA requires (or permits) the mandatory payments under §1402 to be reduced based on the size of premiums charged by an insurer, an insurer's rate of return on sales, its overall profit, or any other market or external factors.

137.     The statutorily-mandated CSR payments the Government owes Plaintiff cannot be reduced as a result of contracts-based mitigation or offset theories that are not set forth in the ACA and have no statutory basis.  The ACA imposes no obligation of mitigation on QHPs, and no right of offset to the Government with respect to the QHP issuers' unconditional right to receive the statutorily-mandated CSR payments due.

138.    As a direct result of the United States' violation of Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1), BCI has not been paid the 2020 CSR payments owed and has been damaged in the amount of at least $11,959,194.70 as of the filing date of its this Complaint, together with post-judgment interest, costs of suit, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant, the United States of America, as follows:

(1)    On Count I, awarding monetary damages sustained by Plaintiff for the unmade 2018 CSR payments owed by the Government, in the amount of at least $30,970,025.78, subject to proof at trial, as a result of the Defendant's violation of Sections 1402 and 1412 of the ACA and of 45 C.F.R. § 156.430 regarding the advance CSR payments owed to Plaintiff for CY 2018;

(2)    On Count II, awarding monetary damages sustained by Plaintiff for the unmade 2019 CSR payments owed by the Government, in the amount of at least $23,521,750.29, subject to proof at trial, as a result of the Defendant's violation of Sections 1402 and 1412 of the ACA and of 45 C.F.R. § 156.430 regarding the advance CSR payments owed to Plaintiff for CY 2019;

(3)    On Count III, awarding monetary damages sustained by Plaintiff for the unmade 2020 CSR payments owed by the Government, in the amount of at least $11,959,194.70, subject to proof at trial, as a result of the Defendant's violation of Sections 1402 and 1412 of the ACA and of 45 C.F.R. § 156.430 regarding the advance CSR payments owed to Plaintiff for CY 2020;

(4)    On all Counts, awarding all available interest, including, but not limited to, post-judgment interest, to Plaintiff;

(5)    On all Counts, awarding all available attorneys' fees and costs to Plaintiff; and

(6)     On all Counts, awarding such other and further relief to Plaintiff as the Court

deems just and equitable.

Dated: March 5, 2021                           Respectfully Submitted,

*Of Counsel:*                                  s/ Lawrence S. Sher
                                               Lawrence S. Sher (D.C. Bar No. 430469)
                                               **REED SMITH LLP**
Gregory Vose (PA Bar No. 324912)               1301 K Street NW
**REED SMITH LLP**                             Suite 1000-East Tower
Reed Smith Centre                              Washington, DC 20005
225 Fifth Avenue, Suite 1200                   Telephone: 202.414.9200
Pittsburgh, PA 15222                           Facsimile: 202.414.9299
Telephone: 412.288.3131                        Email: lsher@reedsmith.com
Facsimile: 412.288.3063
Email: gvose@reedsmith.com                     *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2021, a copy of the foregoing Complaint and accompanying Exhibits were filed electronically with the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing with be sent to all parties by operation of the Court's ECF system.

s/ Lawrence S. Sher

Lawrence S. Sher

*Counsel for Plaintiff*